Baldwin. J.
In these causes it appears from the r 1 record that Watson and Comer, gamblers by profession, were associated several years in one or more copartner- ,. , . , . , . , , ships for gaming purposes, during which others were eonnected with them, from time to time, as sub-partners. The particular partnership out of which this controversy has arisen existed early in the year 1841, and perhaps previously, and continued until' Comer’s death in the month of April 1844. The information which we have of the operations of this concern, is mainly in regard to an establishment on 14th street in Richmond, where a faro bank, with its appurtenances, was kept, in a house purchased by Watson & Comer from Galt, on the 1st of February 1841, at the price of $ 8000, of which one third was to be paid in cash and the residue in two equal annual instalments. At the date of this contract the house and lot was conveyed by the vendor to the purchasers jointly, and the deferred instalments were secured by the joint bonds of the latter, and a deed of trust which they gave upon the property.
Of the terms of this gaming partnership we have but little reliable or distinct information. It does not appear that there was any written partnership agreement, or that there were any partnership books, or that any other means now accessible have been preserved, of ascertaining the capital stock invested in the business, or its expenses, profits and losses, or the advances made to or receips from the concern, by the respective partners, or to or from each other upon the faith of the partnership funds or resources. In short, there are no adequate materials for a settlement and adjustment of the, partnership affairs for the purpose of ascertaining any supposed rights or interests of the parties litigant therein, or their respective claims against each other arising therefrom, if such settlement and adjustment were at all allowable in a court of justice.
*13 But it is clear that a Court of equity will not lend its aid for such a purpose, nor give relief to either partner against the other, founded upon transactions arising out of their immoral and unlawful partnership, whether for profits, losses, expenses, contribution or reimbursement. I am not aware of any reported case in relation to a gambling partnership; but the principle is a general one in reference to partnerships prohibited by law or for an unlawful purpose; and prevails at law as well as in equity. Coll. Part. 50, ed. of 1848; Gow. Part. 119 ; 1 Bac. Abr. 109, n. Assump. A, ed. of 1846; Aubert v. Maze, 2 Bos. &. Pul. 371; Holman v. Johnson, Cowp. R. 343; Watson Part. 5, 7; Griswold v. Waddington, 16 John. R. 438, 486, 489; Mitchell v. Cockburn, 2 H. Bl. 379; Knowles v. Haughton, 11 Ves. R. 168. And it is applicable with peculiar force to such an association as the one developed in this controversy, the object of which was a tissue of offences, and a course of conduct denounced, restrained and severely punished by law; and moreover not only contrary to good morals, but highly prejudicial to the public interests. There is in the administration of justice but one rational and politic treatment of the mutual claims of such associates, thus springing out of their spoliations upon society, and that is, to refuse them all aid in the prosecution of their respective demands of that nature against each other. Of this the parties litigant and their counsel in the Court below were doubtless apprised, and accordingly we find that the true character of the association and of its operations is withheld from the. pleadings; but it is sufficiently exposed by the evidence.
Comer, at his death, left a will, by which he gave all his estate, real and personal, to Ellen Fletcher, a woman who had lived with him a number of years in a state of illicit intercourse, charged, however, with the payment of his debts, and directing that his other *14 property should be sold before the house and lot where he resided on L street. The will was admitted to probat, and the executor named therein declining to take upon himself the burthen thereof, Watson qualige(j ag a<jministrator with the will annexed, and took possession of the decedent’s papers. The testator, however, after the making of his will, and shortly before his death, executed deeds to Fletcher, by which he conveyed to her the house and lot on L street, and his furniture therein.
Watson, soon after his qualification as administrator, filed his bill in that character, and also in his individual right, against Fletcher, in which he alleged himself to be a creditor of his testator’s estate to a large amount, specifying his claims to be, 1, Comer’s moiety of the purchase money of the house and lot on 14th street, the whole of which he charged that he had himself paid, and for which moiety he represented that he had-an equitable lien on Comer’s undivided moiety of that-property, the sufficiency of which for his reimbursement he considered very doubtful; 2, the sum of 415 dollars, with interest from the 18th of April 1840 ; 3, the sum of 2795 dollars 87 cents, with interest from the 15th of October 1842; 4, about 1000 dollars for money loaned to or paid for him. For all these claims he alleged that he had vouchers, but these were not exhibited with the bill. He represented that, being the personal representative of Comer, he could not sue himself, and thus place his debts on the footing of judgments, as other creditors differently situated might do. He further represented the insufficiency of assets, and charged that Comer, at the time of executing the deeds above mentioned, was, from the disordered state of his mind, incapable of contracting, and that the deeds were without consideration and fraudulent. And he prayed an injunction to prevent the defendant from disposing of the property conveyed, and that the deeds *15 might he declared null and void, and the' property to belong to his testator’s estate, and subject to the payment of his debts.
We need not consider whether the provision in Comer’s will for the payment of debts was a mere charge upon his estate for that purpose, with a direction as to the order in which that charge should be enforced; or a devise of lands to be sold for the same purpose, to be executed under our statute, 1 Rev. Code, ch. 104, <§> 52, p. 388, by his personal representative. Watson himself seems to have thought, that as administrator, with the will annexed, he had authority to make sales of his testator’s real estate, as well as personal, and he appears from the language of his bill to have only desired the aid of the Court to remove out of his way the deeds to Fletcher, which invested her with the title to the property thereby conveyed, and operated pro tanto as a revocation of the charge for payment of debts. And we find that a few days after filing his bill and obtaining his injunction, he advertised a sale of Comer’s undivided moiety of the house on 14th street, and of the furniture therein. In this he acted improperly and oppressively. Having invoked the jurisdiction of the Court to establish the validity of his claims as creditor, and the invalidity of the conveyances to Fletcher, he thereby placed his whole trust and authority under the control and direction of the Court, and it was an abuse of his fiduciary relation to proceed to sell an important portion of the real estate, before an adjudication could be had of the. matters in controversy between him and the only object of his testator’s bounty. To arrest the contern-plated sale, Fletcher filed her bill, and the injunction which she prayed was granted. Her bill, and her answer subsequently filed to Watson’s bill, put in issue the justice of his demands, and assert that nothing will be found due to him upon a fair settlement before a commissioner of the Court.
*16 Under interlocutory decrees for accounts, several settlements thereof were made by a commissioner of the Court, and numerous depositions and vouchers were returned and filed.
It appears from the evidence that the deeds to Fletcher were executed by Comer when he was in due possession of his mental faculties, and were not obtained from him by any fraud or duress, but were his own spontaneous acts. They were not made, it is true, for the pecuniary considerations expressed to have been paid by her, and therefore stand in relation to ere-' ditors, as she admits in her answer, merely upon the footing of voluntary conveyances. But they are not the less obligatory from that circumstance upon the representatives of the grantor, and are good against them both at law and in equity, notwithstanding the character of the cohabitation between the parties. A bond or other instrument for the consideration upon its face of future cohabitation is doubtless unlawful and void, but not where the consideration expressed is for past cohabitation, for that is not incompatible with a motive of honour and duty, Newl. Cont. 488, and serves only to place it upon the footing of a voluntary deed. And though equity has, on the ground of fraud, enquired into the consideration of, and given relief against, securities obtained by the arts of common prostitutes, yet a great Judge has held that the cases which have determined against securities given to common prostitutes, went upon the circumstance of the securities being given previous to the cohabitation, which being turpis in its nature, the Court had relieved against them; but that there was no principle of equity which says that a man may not give a voluntary bond to a common prostitute, and that it would be going but a little further to say he could not give her money without being liable to be called upon for it. Hill v. Spencer, Ambl. R. 641. In the present case, however, *17 there is no proof, nor even allegation, that the grantee was a common strumpet, nor any reason to believe that the grantor was influenced by any other motive than a sentiment of attachment for her, and a desire in his last illness, and in view of approaching death, to secure to her some provision for her future maintenance. And, in fact, a successful impeachment of the deeds, upon any ground, could avail Watson nothing in this controversy; for if the deeds were null and void, the will devising the estate to Fletcher, and which has been admitted to probat, would still remain ; and no one supposes that could ever have been impeached, whatever might have been the want or turpitude of consideration.
The most important of Watson’s claims against his testator’s estate, is that for contribution on account of the purchase money of the house and lot on 14th street. The evidence is satisfactory to shew that the whole amount of the purchase money has been paid by Watson, and there is no reason to believe that his payments thereof were not made out of his individual resources. On the contrary, the relative pecuniary condition of the two persons, and the cotemporary declarations of Comer, warrant the conclusion that he contributed nothing himself, directly or indirectly, on that score. Watson is therefore entitled to the reimbursement sought by him on this head, and to an equitable security therefor upon Comer’s undivided moiety of the property, unless, indeed, his demand can be repelled, as falling within the influence of the unlawful gambling partnership which existed between them.
There is no proof that this property formed any part of the partnership funds, or that it was purchased for a gambling establishment, though the circumstances of the case seem to indicate it as probable that the parties, at the time of their purchase, contemplated the use of *18 it by themselves for gaming purposes. It was a joint purchase in fee by these persons, upon the strength of their individual resources and credit, of real estate, to be held by them and their representatives in perpetuity, or untq alienation; and the temporary abuse of it by gaming operations could stamp no permanent unlawful character upon the property. The contract with the vendor was perfectly lawful; each of the joint vendees was liable to him for the whole purchase money; from that liability Watson could not escape, and has fully discharged it; and his right to contribution is the legal and equitable consequence. It is not founded upon or derived through the unlawful partnership, but springs from a transaction collateral thereto, though it may have been connected therewith; and in such cases I take the true principle to be, that the claim to contribution or reimbursement cannot be repelled. See Gow. Part. 109; Toler v. Armstrong, 4 Wash. C. C. R. 297; 11 Wheat. R. 258.
Watson’s claim to a debt, as due him from his testator, of 2795 dollars 87 cents, with interest from the ,15th of October 1842, stands upon a different footing. His bill is silent as to the consideration and nature of that debt. But his answer to Fletcher’s bill states it to be due by a bond, of the amount and date just mentioned, executed to him by Comer, on a settlement of all accounts between them, except 415 dollars, (mentioned in his bill,) for which Comer had previously, to wit, on the 18th of October 1840, given him his obligation, (a due bill under seal.) By the interlocutory decree of June 1845, recommitting a report which had been returned by the commissioner, with the exceptions thereto, for a general and thorough resettlement of the accounts between Watson and Comer, an enquiry was directed as to the consideration of the bond for 2795 dollars 87 cents, with authority for Watson’s examination upon oath.
*19 The direction of this enquiry was perfectly proper, for obvious reasons. There was at least aprima fade repugnancy between the execution of that bond, upon a settlement between the parties of their accounts, on the 15th of October 1842, and Watson’s claim for a moiety of the whole amount of the purchase money of the house and lot; it appearing from his vouchers that the cash payment was made by him in February 1841. There was, when the enquiry was directed, evidence in the record disclosing the gambling partnership, and in relation to its operations, and mutual claims of the parties litigant arising therefrom. It was a duty which the Court owed to itself and the public, to sift these transactions thoroughly, in order to repel all efforts to make it the instrument of enforcing or relieving against the turpis contractus, and its consequences, at the instance of either of the parties, standing as they did in pari delicto. This was emphatically so when the personal representative, with his decedent’s papers in possession, was seeking to charge his estate with a heavy debt as due upon settlement, without any proof or even suggestion of the nature of the dealings upon which it was founded. The enquiry, therefore, was warranted by the evidence, and, under the circumstances, it would be idle to consider whether it was covered by the pleadings. A reference to them, however, will serve to shew that the substantial controversy between the parties was, whether Watson was a creditor (and of course a lawful creditor,) of Comer, and if so, to what amount.
The result of the enquiry directed into the consideration of the bond was, that, according to Watson’s own shewing before the commissioner, it embraced Comer’s moiety of the cash payment for the house and lot on 14th street, and numerous items of account arising out of the operations of the gaming establishment. It was therefore disregarded in the resettlement by the commissioner, and also in his final report; and the accounts restated as if it had never been executed.
*20 The claim of Watson in his bill for a debt of about 1000 dollars, as due to him from his testator, “ for money loaned to him or paid for him,” falls into the consideraq£ tqe unliquidated matters of account, exclusive q£ qie purchase money of the house and lot.
These unliquidated matters of account, it is obvious, have originated to a great extent, if not entirely, out of the relation between Watson and Comer as partners in the gambling concern; and the difficulty is in ascertaining how far, if at all, they can be treated as individual transactions between them, which would not properly belong to a settlement of the partnership affairs, if that were allowable.
Such of them as consist of bills paid for supplies of provisions and liquors for the comfort and refreshment of gaming guests, or for furniture and other articles purchased for the concern, or of collections of debts due the partnership, are upon their face of such a nature as to condemn and expunge themselves from the controversy.
The debits and credits claimed for bills paid to mechanics for the fitting up, reparation and improvement of the house and lot while used as a gaming establishment ; and for payments during the same period, of taxes, insurance and the like; and for collections of rents of a part of the building occupied by tenants, require more consideration. If these items could be referred exclusively to the joint ownership of thé property in fee, and its permanent advantage — if the expenditures were such as would have been equally incurred by joint owners unconnected as gambling partners — if the payments were made out of their respective individual means, and not out of the capital, profits or funds of the partnership— if the rents were applied to their individual, and not to their partnership purposes; in a word, if their expenditures upon and receipts from the property appeared to be separate and distinct from their gambling operations, *21 and, so, unaffected and untainted by the turpitude of their temporary association, I would think that such matters of account would be proper for adjustment by , i -.1 the Court. But I do not so understand the evidence. The house, though owned jointly, was devoted during the partnership to the purposes of the concern; the use of it for that period may be regarded as part of their stock in trade; and its revenues and charges were blended indiscriminately with the partnership affairs. It is impossible now to separate them; that could not be done, if at all, without a settlement of the gambling partnership, including its capital stocks, profits and disbursements ; even if the Court could lend its authority for such a purpose.
The items for moneys loaned or advanced by one partner to the other, stand upon the like footing. It does not appear from any distinct or reliable evidence, that the sums reported by the commissioner on this score were derived from individual funds, or designed for other than partnership objects. Indeed, it appears from Watson’s examination before the commissioner, that a sum corresponding with that claimed by Watson, in his bill, “ as loaned to Comer, or paid for him,” was sent to Comer by a servant, to pay mechanics’ bills, and buy furniture; and that the 500 dollars per check, claimed before the commissioner, was furnished for the same purpose. The further sum, it is true, reported by the commissioner per note for 600 dollars to Tate, is stated by Watson, in his examination, to have been a loan to Comer for his own purposes; and the answers of a party to interrogatories upon such an examination are doubtless evidence for him, to the same effect as a responsive answer to a bill, but liable to discredit in like manner; and no one can read the examination before the commissioner, without agreeing with the Chancellor, that its statements in support of Watson’s pretensions, are entitled to but little weight. It is to be remarked, also, *22 that the form of the transaction as stated, a blank endorsemént for raising money, left by the absent with the resident partner, indicates an advance to the firm rather than a loan to the individual. And that such w tke fac^ jg shewn by Watson’s own statement of the items of the settlement of the 15th of October 1842, when Comer’s bond for 2795 dollars 87 cents was executed; in which Comer is debited with only a moiety on account of the note to Tate, and with a moiety only of the 1000 dollars per servant, and of the 500 dollars per check; and credited with a moiety of a large amount of disbursements in payment of mechanics’ and other bills.
Of the unliquidated matters of account between the parties, there remains only to be noticed, the credit to Comer, reported by the commissioner, of 1065 dollars 46 cents, on account of the debt from Garden. That debt appears from the evidence, and is admitted by Watson, to have been due to Comer individually, and the sum credited was furnished by Watson, as the true amount for which he was accountable. It may be doubted whether the credit is not short of the proper sum; but the materials for correcting it, if wrong, are not in the record, and there appears no sufficient reason for disturbing it.
The claim of Watson in his bill for a debt of 415 dollars, as due him from Comer, with interest from the 18th of April 1840, without explanation of its consideration or nature, appears from the voucher subsequently filed, to be evidenced by the due bill under seal of that amount and date. It is therefore not embraced by the period for which the accounts between the partners have been reported by the commissioner, commencing in February 1841. And yet, there is evidence that they were gambling partners during several years previous to that date, and of course, at and before the date of the due bill; and of outstanding gaming debts due them, *23 and collections on account of them, made by the partners respectively in the year 1839. And there is no evidence of any legitimate business transactions between them prior to the execution of the due bill. The presumption of law from a due bill under seal, is that it was given for a true and lawful consideration ,* but in this case, the presumption of fact, under the circumstances, is the other way. And the claim, with others, proved to have sprung ex turpe causa, is preferred in a Court of equity, by a fiduciary, in possession of his decedent’s papers, and seeking to subject the estate which he represents, without evidence, or even suggestion, of the consideration upon which it is founded. I think it ought not to be sustained.
The foregoing views dispose of all the matters of controversy between the parties down to the time of Comer’s death; and the result of them, if correct, is to reject all the items of debit and credit reported by the commissioner, until that period, except the debits in favour of Watson, on account of his payments of the purchase money of the house and lot on 14th street, and the credit in favour of Comer, on account of Garden’s debt.
I think, therefore, that the decree of the Chancellor ought to be reversed, and the injunctions whieh had been granted to the parties respectively, and the order for the appointment of a receiver, reinstated'; that the accounts between the parties down to the time of Comer’s death, should be recommitted and reformed as above designated ; that the administration account ought also to be recommitted and reformed, and continued so as to exclude all credits to the administrator for costs and counsel fees in these suits, and add all proper debits against him for debts due the estate which he has collected, or ought to have collected; and on account of the rents of the house and lot on 14th street, which have accrued since Comer’s death, with the pro *24 per deductions for repairs, taxes, insurance and the like ; that the whole of the furniture in the house on 14th street, ought to be sold under the direction of the Court, and a moiety of the nett proceeds paid to Watson, and the other moiety carried into the administration account to the credit of the estate. That furniture was no doubt purchased for the gambling establishment; but it does not fall within the principles above indicated; for Comer’s undivided moiety thereof having come to the hands of Watson as his personal representative, it would not be competent for the latter to deny, on any such ground, the title of his testator; and in fact, he has not done so, but has held and treated the same as belonging to the estate. He was wrong, however, in the attempt to sell Comer’s undivided moiety of the furniture, the proper course in such cases of joint ownership of such property being to sell the whole, and divide the proceeds.
I am further of opinion that the creditors of Comer’s estate ought to be convened before the commissioner, by a public notice to come in and assert and prove their demands. This is proper in order to close the administration, and to the due disposition and application of the assets legal and equitable. After the balance of principal money and interest due to Watson, shall have been ascertained, as also the sums due to other creditors, the Court should proceed according to the rules of equity, observing due priorities, to charge the same upon the assets legal and equitable, and to a final decree according to the rights of the parties.
The other Judges concurred in the opinion of Judge Baldwin.
The following was the decree of the Court:
The Court is of opinion, that the decree is erroneous, and ought to be reversed and annulled, and the in *25 junctions which had been granted to the parties respectively, and the order of the 27th of June 1846, for the appointment of a receiver, reinstated; that the accounts between the parties down to the time of Comer’s death, should be recommitted and reformed, by rejecting all the items of debit and credit reported by the commissioner until that period, except the debits in favour of Watson on account of his payments of the purchase money of the house and lot on 14th street, and the credit in favour of Comer on account of Garden’s debt; that the administration account ought also to be recommitted and reformed, and continued, so as to exclude all credits to the administrator for costs and counsel fees in these suits; and add all proper debits against him for debts due the estate which he has collected, or ought to have collected, and on account of the rents of the house and lot on 14th street, which have accrued since Comer’s death, with the proper deductions for repairs, taxes, insurance and the like; that the whole of the furniture in the house on 14th street, ought to be sold under the direction of the Court, and a moiety of the net proceeds paid to Watson, and the other moiety carried into the administration account to the credit of the estate ; that the creditors of Comer’s estate ought to be convened before the commissioner, by a public notice, to come in and assert, and prove their demands; and that after the balance of principal money and interest to Watson, shall have been ascertained, as also the sums due to other creditors, the Court should proceed, according to the rules of equity, and observing due priorities, to charge the same upon the assets, legal and equitable, and to a final decree, according to the rights of the parties. It is, therefore, adjudged, ordered and decreed that the said decree of the Chancery court be reversed and annulled, with costs to the appellants respectively; and that these causes be remanded to the Chancery court, to be proceeded in according to the principles above declared.